1  GREENBERG TRAURIG, LLP
2  MATTHEW R. GERSHMAN (SBN 253031)
   gershmanm@gtlaw.com
3  RYAN C. BYKERK (SBN 274534)
   bykerkr@gtlaw.com
4  1840 Century Park East, Suite 1900
5  Los Angeles, CA 90067-2121
   Telephone:  310-586-7700 / Facsimile: 310-586-7800
6
7  CAMERON M. NELSON (Pro Hac Vice)
   nelsonc@gtlaw.com
8  77 West Wacker Drive, Suite 3100
9  Chicago, IL 60601
   Telephone: 312-456-8400 / Facsimile: 312-456-8435
10
11 *Attorneys for Plaintiff UL LLC*

12                **UNITED STATES DISTRICT COURT**

13            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15 UL LLC,                              Case No.: 2:16-CV-08172-CAS (AFMX)

16         Plaintiff,                   *Hon. Christina A. Snyder*

17 v.                                   **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES IN SUPPORT OF**
18 The Space Chariot Inc., a California **PLAINTIFF UL'S MOTION FOR**
   corporation; Kevin Walker, an individual; **PARTIAL SUMMARY JUDGMENT**
19 Donabelle Escarez Mortel, aka Donabella **AGAINST THE SPACE CHARIOT**
   Mortel , an individual; and John Does 1-10, **INC., KEVIN WALKER AND**
20 individuals,                         **DONABELLE ESCAREZ MORTEL**
                                        **REGARDING COUNT 1 (FEDERAL**
21         Defendants.                  **TRADEMARK INFRINGEMENT) AND**
                                        **COUNT 2 (COUNTERFEIT OF**
22                                      **REGISTERED MARK)**
23
24
25
26
27
28

─────────────────────────────────────────────
          MEMORANDUM I/S/O PARTIAL SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................1

II.    BACKGROUND ...................................................................................2

       A.    UL's Trademarks and The UL® Brand ........................................2

       B.    The Defendants.............................................................................3

       C.    Defendants' Counterfeiting of the UL Marks ................................5

       D.    Defendants Flouted Court Orders and Obstructed Discovery .......7

III.   ARGUMENT........................................................................................10

       A.    Defendants Are Liable for Trademark Counterfeiting and Statutory
             Damages Under 15 U.S.C §1117(c). ...........................................10

       B.    The Undisputed Facts Show that Defendants Were Willful.........15

       C.    The Undisputed Facts Justify $2,000,000 in Statutory Damages. ...............17

       D.    The Undisputed Facts Justify an Award of Attorneys' Fees. .......25

IV.    CONCLUSION.....................................................................................25

---

i

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

CHI 67942460v7

## TABLE OF AUTHORITIES

**Cases**

*AARP v. Sycle,* 991 F.Supp.2d 224, 229-30 (D.D.C. 2013) ........................................16, 20

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)..............................12

*Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007)......................11

*Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) ........................................................................................................10, 12

*Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165 (S.D.N.Y. 2007)..................................4

*Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 124, 1229 (7th Cir. 1991) .......................17

*Lorillard Tobacco Co. v. S&M Central Service Corp.*, 2004 WL 2534378 (N.D. Ill. Nov. 8, 2004) ........................................................................................................................14

*Louis Vuitton Malletier S.A. v. LY USA, Inc., et al* 676 F. 3d 83, 111 (2d Cir. 2012) ......25

*Louis Vuitton S.A., et al. v. Spencer Handbags Corp.*, 765 F. 2d 966, 970 (2nd Cir. 1985) ........................................................................................................................22

*Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990)........................................11

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) ........................................................................................................................12

*Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999).....17

*SATA GmbH & Co. KG v. Wenzhou New Century Int'l*, 2015 U.S. Dist. LEXIS 147637 (C.D. Cal. Oct. 19, 2015) ................................................................................................12

*TI Bev. Group Ltd v. S.C. Cramele Recas SA*, No. LA CV 06-07793-VBF, 2014 U.S. Dist. LEXIS 188074, at *21-22 (C.D. Cal. Oct. 10, 2014)........................................4

*UL, LLC v. Swagway, LLC*, Case No. 3:16-cv-00075 (N.D. Ind. Feb. 17, 2016).............24

**Statutes**

15 U.S.C. § 1051 ..............................................................................................................25

15 U.S.C. § 1057(b) .........................................................................................................11

15 U.S.C. § 1115(b) ...........................................................................................................3

15 U.S.C. § 1125(a)(1)(A) .................................................................................................4

15 U.S.C. § 1127 .........................................................................................................10, 12

15 U.S.C. §1117 .............................................................................. 10, 14, 15, 19, 22, 25

**Other Authorities**

4 J. Thomas McCarthy, *McCarthy on Trademarks* §25.10, at 25-17 (2002) ...................13

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants The Space Chariot, Inc., Kevin Walker and Donabelle Escarez Mortel a/k/a Donabella Mortel (collectively, "Defendants" or "Space Chariot") used counterfeit UL Certification Marks on their websites to falsely advertise their self-balancing scooters ("hoverboards") as being certified by UL. In spite of Defendants' attempts to stall this litigation and obstruct discovery, UL has now collected overwhelming evidence of Defendant's willful counterfeiting. Accordingly, UL moves for partial summary judgment on the questions of liability and willfulness with respect to Count 1 (federal trademark infringement) and Count 2 (federal trademark counterfeiting), and asks the Court to award statutory damages in the amount of $2 million.

There are no questions of material fact as to whether Defendants used counterfeit UL marks to trick consumers into believing that Defendants' hoverboards were UL-certified. Defendants were in full control of the <spacechariot.com> domain and website, and the Space Chariot social media accounts, which falsely claimed that Space Chariot's hoverboards were UL-certified. Defendants even claimed their products were UL-certified before a certification for hoverboards even *existed*. When UL-certified hoverboards *did* become available, Defendants deliberately chose to sell non-UL-certified hoverboards (while still advertising their inventory as UL-certified). Because there is no dispute that Defendants sold non-UL-certified hoverboards while advertising their products as UL-certified, Defendants' liability is beyond question.

There are also no questions of material fact that Defendants' counterfeiting was willful. It is undisputed that Defendants never sought UL's permission to use the UL marks. That alone should be sufficient evidence of willfulness, as Defendants never had any reasonable basis for believing that they were authorized to use the UL marks. But the Court need not rely on this undisputed fact alone; there are text messages and emails showing that Defendants' supplier explicitly, and repeatedly, told Defendants that its

hoverboards were not UL-certified – and yet Defendants continued to advertise the hoverboards as UL-certified. At one point, Defendants' supplier offered UL-certified hoverboards to Defendants, and Defendants explicitly *rejected* those hoverboards in favor of non-certified ones. This undisputed evidence proves Defendants' malicious intent. Still further proof of Defendants' malicious intent can be found in Defendants' obstructive approach to discovery.

Once liability and willfulness are proven, UL asks the Court to address the question of statutory damages. The Lanham Act authorizes the Court to award anywhere between $3,000 and $6,000,000 in statutory damages. In view of Defendants' extensive sales, Defendants' malicious intent and Defendants' obstructionist discovery behavior, UL believes an award of 2 million dollars is appropriate.

## II.     BACKGROUND[1]

### A.     UL's Trademarks and The UL® Brand

UL is a global independent safety science company offering certification, validation, testing, inspection, and advising services for a variety of industries around the globe. (Declaration of Robert Pollock, Dkt. No. 6, at ¶ 6.) UL has been testing products and authorizing use of their famous UL Certification Marks on products that conform to UL's Standards for Safety since at least 1937. (*Id.* at ¶ 9.)  Manufacturers seek UL certification and listing in the UL certification directory by submitting representative product samples to UL for evaluation and/or testing. (SUF 7.) UL examines these samples and determines whether the samples comply with the applicable standard. (*Id.*)

The UL Certification Marks are renowned as symbols of UL's testing, inspection and certification services originating with UL. (SUF 2.) The UL certification marks are central to UL's brand and business. (*See* Declaration of Pollock, Dkt. No. 6, at ¶ 13.) UL

---

[1] The material facts relevant to this motion are undisputed and are followed by a citation to the concurrently filed Separate Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), which includes citations to supporting evidence. Additional included facts provide context, but they are not necessary to decide this motion.

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

has sought to protect its UL-in-a-circle certification mark and UL service mark with the United States Patent and Trademark Office. Specifically, federal registrations have been obtained for the following marks:

- (UL) (U.S. Reg. No. 782,589);

- (UL) (U.S. Reg. No. 2,391,140); and

- UL service mark (U.S. Reg. No. 4,201,014)

(collectively, the "UL Marks"). (SUF 3.) The first two trademarks listed above have reached incontestable status pursuant to 15 U.S.C. § 1115(b). (SUF 4.)

UL has the exclusive right to use the UL Marks and authorize customers to use of the UL Marks. (SUF 6.) UL has used the UL Marks extensively to promote its testing and certification services through a wide variety of marketing channels. (Pollock Decl., Dkt. No. 6, at ¶ 11.) Thus, the UL Marks have attained a national and global reputation for technical experience and integrity and have become a symbol of trust and objectivity. (Declaration of Pollock., Dkt. No. 6, at ¶ 12.)

**B.    The Defendants**

The Space Chariot, Inc. ("Space Chariot") is a California Corporation formed by Defendant Kevin Walker in July, 2015. (SUF 10-11.)[2] Space Chariot sold self-balancing scooters commonly known as "hoverboards." (SUF 10.)[3]

Kevin Walker ("Walker") and his girlfriend, Donabelle Mortel ("Mortel"), own and operate Space Chariot. (SUF 11-12.) Walker holds himself out as the CEO and President (SUF 11), while Mortel holds herself out as the Vice President. (SUF 12; Ex.

---

[2] At his deposition, Mr. Walker denied that the signature on The Space Chariot, Inc.'s Articles of Incorporation was his signature, but did not dispute that the corporation is his. (Declaration of Cameron Nelson (at Walker Dep., Ex. 15, 40:7-45:17).)

[3] It appears that Defendants sold off Space Chariot's assets, in violation of the stipulated preliminary injunction and asset freeze, in December 2016. It is unclear whether Defendants continued selling hoverboards through other domain names. *See* Section 2.D, *infra*.

14.)[4] Space Chariot had employees from time to time, but these employees were merely "kids" working at the direction and control of Walker and Mortel. (Declaration of Cameron Nelson ("Nelson Decl.") (at Walker Dep., Ex. 15, 56:12-57:3)[5].)

Walker and Mortel lease a single office at 5250 North Lankershim Blvd, Suite 500, North Hollywood, California 91601. (*Id.* (Walker Dep., Ex. 15, 16:6-21:4, 57:22-63:4, 67:10-68:4, 69:25-71:6).) The office has a door, desk, and computer, and only Walker, Mortel, and a single employee have a key. (*Id.*) Defendants run Space Chariot and at least two other businesses, "The Creation Station" and "Creative Geniuses" out of that office. (SUF 13; Ex. 16; Ex. 15, 18:7-20:9, 30:5-32:18, 34:11-35:16.)[6] Walker and Mortel have not created separate corporations for these businesses; the only actual California corporation they own or operate is The Space Chariot, Inc. (*See* SUF 14;  Walker Dep., Ex. 15, 34:14-16.) Defendants keep cash from these businesses in a drawer in the office, and at least Defendant Walker uses cash to pay himself his "Space Chariot" compensation, as well as to purchase inventory. (Walker Dep., Ex. 15, 70:6-18, 99:5-101:1).)

---

[4] The Lanham Act applies personal liability for counterfeiting. The Lanham Act imposes liability upon, "***Any person*** who, on or in connection with any goods or services … uses in commerce … any false designation or origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1)(A) (emphasis added). Under the Lanham Act, a corporate officer or director may be held personally liable for trademark infringement and unfair competition. *TI Bev. Group Ltd v. S.C. Cramele Recas SA*, No. LA CV 06-07793-VBF, 2014 U.S. Dist. LEXIS 188074, at *21-22 (C.D. Cal. Oct. 10, 2014) (citing *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165 (S.D.N.Y. 2007)).

[5] Exhibit 15 – and the other Exhibits cited herein are attached to the Declaration of Cameron Nelson, filed concurrently herein.

[6] At his deposition, Walker denied being associated with or receiving income from any businesses other than the Creation Station and Space Chariot, but the Facebook page at Exhibit 16, and the LinkedIn page attached to Mr. Olive's declaration, clearly show Mr. Walker is also running Creative Geniuses.

4

CHI 67942460v7

Walker and Mortel both have a significant presence on social media, and both personally promoted Space Chariot hoverboards via their personal social media accounts, by retweeting, liking, and/or otherwise promoting Space Chariot. (SUF 15; Ex. 14; Walker Dep., Ex. 15, 55:17-57:3, 75:12-76:24.)

### C.     Defendants' Counterfeiting of the UL Marks

Shortly before the 2015 holiday season, incidents of hoverboards catching fire received significant of media attention. Unscrupulous hoverboard sellers, including Defendants, quickly responded to this negative media coverage by falsely claiming their hoverboards were UL-certified. Indeed, as shown, Defendants extensively advertised their hoverboards as UL-certified even though they knew full well that their products had never received any certification or approval from UL.

For instance, Defendants began claiming their hoverboards were UL "safety certified" at least as early as December 10, 2015. (SUF 16-18; Ex. 17.) At that time, a safety standard for hoverboards did not even *exist*, and UL had not certified *anyone's* hoverboards. (SUF 19-20.) Defendants never made any attempt to contact UL, and never asked UL for authorization to use the UL mark in their advertising. (SUF 23, 41.)

Defendants also repeatedly received explicit notice that their hoverboards were *not* UL-certified, at least nine times.

First, UL's announcement of its 2272 standard put Defendants on notice. The announcement explicitly invited retailers and manufacturers to submit hoverboards for product testing for the first time. (SUF 21; Ex. 18.) Defendants were aware of this announcement. (SUF 22; Walker Dep., Ex. 15, 53:8-53:20.) Defendants never contacted UL or submitted their products for testing (SUF 23; Walker Dep., Ex. 15, 50:15-52:4, 53:8-53:20), but continued to advertise their hoverboards as UL-certified on their website and on social media.  (SUF 25; Ex. 19.)

Second, UL's April 26, 2016 cease and desist letter explicitly put Defendants on notice that they were not authorized to advertise their hoverboards as UL-certified. (SUF 26.) Yet, Defendants kept advertising their products as UL-certified. (SUF 25; Ex. 19.)

CHI 67942460v7

Third, immediately after Defendants received the April 26th letter, Defendants' supplier, JOMO Technology Ltd ("JOMO Tech"), explicitly told Defendants that it was still *applying* for UL 2272 Certification. (SUF 28; Ex. 22.) Yet, Defendants kept advertising their products as UL-certified. (SUF 25; Ex. 19.)

Fourth, the U.S. Consumer Product Safety Commission ("CPSC") informed Defendants on May 17, 2016 that it was investigating whether Defendants' hoverboards comply with the UL 2272 standard. (SUF 29; Ex. 23.) Yet, Defendants kept advertising their products as UL-certified. (SUF 25; Ex. 19.)

Fifth, on the same day that the CPSC put Defendants on notice of its investigation, JOMO Tech told Defendants that the hoverboards were still with UL for testing. (SUF 30; Ex. 24.) Yet, Defendants kept advertising their products as UL-certified. (SUF 25; Ex. 19.)

Sixth, UL called Defendants on May 18, 2016. UL explained that Space Chariot is not a customer of UL, that UL had not conducted any tests on Space Chariot's hoverboards, and that the hoverboards were therefore not "safety certified" by UL. UL further explained that Defendants were not authorized to use UL's certification mark or claim that Space Chariot hoverboards were certified by UL. (SUF 31.) Yet, Defendants kept advertising their products as UL-certified. (SUF 25; Ex. 19.)

Seventh, JOMO Tech told Defendants "Good news, we are almost to pass UL2272" on June 2, 2016. (SUF 32; Ex. 27.) Not only did Defendants continue to advertise their products as UL-certified, Defendants created a new "blog" article on their website on June 6, 2016 claiming that "Space Chariot, Inc. Hoverboards are UL 2722 Certified." (SUF 33; Ex. 20.)

Eighth, when Defendants' supplier finally received UL certification on *some* of its hoverboards, Defendants *rejected* those products as too expensive, and continued to purchase non-certified hoverboards, while *still* advertising their products as UL-certified. JOMO Tech did not send their first shipment of UL 2272-certified hoverboards from China until July 20, 2016. (SUF 34; Ex. 26.) JOMO Tech told Defendants on August 4,

6

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

2016 that "the product with UL 2272" arrived at their warehouse in Walnut, California and encouraged Kevin Walker to go pick up the UL 2272-certified product. (SUF 36; Ex. 27.) By coincidence, that same day, a UL investigator ordered a Space Chariot hoverboard. Space Chariot delivered a *non* UL 2272-certified hoverboard on August 8, 2016. (SUF 37.) At the end of August, Defendants even complained that JOMO Tech was charging for UL 2272-certified hoverboards when Defendants had been buying *non-*UL-certified hoverboards. (SUF 38; Ex. 28.)

Ninth, despite explicitly choosing to buy non-certified hoverboards instead of certified hoverboards, Defendants issued a press release on September 22, 2016, picked up by FOX 5 KVVU-TV, stating that Defendants are "The Safest Hoverboard Company Around," and that all their hoverboards are UL 2272-certified. (SUF 39; Ex. 21.) Defendants continued to advertise their hoverboards as UL-certified in October, while evidence obtained from Defendants confirms they were still purchasing non-certified hoverboards. (SUF 25; Ex. 19.)

## D.   Defendants Flouted Court Orders and Obstructed Discovery

Throughout discovery, Defendants concealed and withheld information regarding their sales of hoverboards, their profits from the sale of hoverboards, and the content of their website. While withholding this information, Defendants violated the Court's Orders by starting new websites that Defendants used to continue their infringing activities, withholding documents they had agreed to produce, and selling off assets.

For instance, Defendants circumvented the Court's November 17, 2016 Temporary Restraining Order ("TRO", Dkt. No. 25) by creating new domain names and moving their operations to those domain names. Specifically, the Court issued a TRO prohibiting Space Chariot from selling or advertising hoverboards that were not certified by UL. (SUF 42; Ex. 33.) As part of this Order, the Court directed that the domain name <spacechariot.com> be disabled. But, by December 1st, 2016, UL had identified three new "Space Chariot" domains - <truehoverboard.com>, <perfecthoverboard.com>, and <spacechariotca.com>. (SUF 43-49; Ex. 40.) The websites found at these domain names

7

CHI 67942460v7

all were substantially similar, if not identical, to the original Space Chariot website. (SUF 43-48; Exs. 34-39.) In most instances, they listed the same addresses, phone numbers, and products as the original Space Chariot website, and included the UL Marks. (*Id.*)

When UL confronted Defendants regarding these new domain names, Defendants' counsel stated "the other sites referred to in your letter do not belong to my clients." (SUF 50; Ex. 41.) Later, Defendants stipulated to an Order directing that they shall "identify all persons affiliated with the domain names truehoverboard.com, perfecthoverboards.com, and spacechariotca.com" by December 15, 2016. (SUF 51; Ex. 45.) Pursuant to that stipulated Order, Defendants' provided the following "identification":

> www.spacechariotca.com - my client was unaware of the existance [sic] of this site and has no contact info for it.
>
> http://www.perfecthoverboards.com/ - Richard – info@perfecthoverboards.com
>
> www.TrueHoverboard.com - Name Unknown – Truehoverboard@gmail.com

(SUF 51; Ex. 42.) When UL pressed for more information, Defendants' counsel represented that Defendants "have produced all info in [their] possession" regarding the "unrelated" sites. (SUF 52; Ex. 43.)

Because of Defendants' transparently-false denials, UL expended significant effort and legal fees issuing and following up on third-party subpoenas. As a result, UL now has affirmative evidence that Defendants were lying, at the very least with respect to the <truehoverboard.com> domain.[7] Specifically, Defendants *did* own the

---

[7] UL strongly suspects the Defendants were also lying about the <perfecthoverboards.com> and <spacechariotca.com> domain names, but the third-party hosting those domains, Shopify, is a Canadian corporation and the cost of pursuing discovery via the Hague Convention seems to outweigh any benefit. It is worth noting that Shopify was Defendants' shopping-cart service provider, and if Defendants secured additional domains, it would have been a natural choice to use Shopify as a host.

8

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

CHI 67942460v7

<truehoverboard.com> domain, and sold it, along with other assets, to one Aaron Wesel ("Wesel") in an agreement dated December 15, 2016. (SUF 53; Ex. 12; Ex. 13; Declaration of Aaron Wesel.) Thus, while Defendants were telling UL that <truehoverboard.com> did not belong to them, Defendants were entering into a written contract regarding their sale of that domain name to Wesel, (*Id.*), which, of course, was also in violation of the Court's November 17 TRO.

In fact, Defendants sold domain names, Facebook accounts, Instagram accounts, and supplier contact information, among other assets, to Wesel for $27,500. (*Id.*) UL does not know what Defendants did with these funds, because they have not complied with the *stipulated* preliminary injunction order. (*See, e.g.*, SUF 54; *see also* Stipulated Preliminary Injunction Order at Dkt. No. 33 (attached to the Nelson Declaration as Ex. 45).) That Order required Defendants to "produce all bank statements in their possession, custody and control from July 1, 2015 to present" by December 15, 2016. (*Id.*) To date, Defendants have only produced two bank statements from a single account – neither of them current. (SUF 54.)

Defendants also took other affirmative steps to stall discovery. Walker testified that he only had access to the email addresses info@spacechariot.com, kevin@spacechariot.com, and thekevinlwalker@gmail.com. (Declaration of Cameron Nelson (at Walker Dep., Ex. 15, 21:5-22).) Based on this testimony, UL negotiated an e-discovery protocol for searching these email accounts with Defendants' counsel. (*Id.*, ¶ 41.) That email search did not uncover any information regarding Defendants' sale of the business – because Defendants had created *another* email address for evading discovery. Indeed, documents produced by third party Aaron Wesel, under subpoena, reveal that Defendants used the email address info@theecreativegeniuses.com to correspond with Wesel. (SUF 55; Ex. 47.)WHOIS records show that the domain theecreativegeniuses.com is registered to Walker and that Mortel personally registered the domain creativegeniusess.com on December 9,2016. (SUF 55; Ex. 44.)

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

To provide just one other example of Defendants' obstruction of discovery, the stipulated preliminary injunction provided that "Defendants shall immediately provide their counsel with means to electronically access the dashboard and administration functions of Defendants' website hosted at SpaceChariot.com, and Defendants' counsel shall produce relevant documents from the website as soon as reasonably possible." (Ex. 45.) Defendants have never produced any such documents. Instead, Defendants produced a single-page printout of one insignificant portion of their website. (Ex. 8.) Simultaneously, Defendants are denying that screenshots provided by UL at the outset of this case, and which confirm Defendants' use of the UL marks, are their website. (Walker Dep., Ex. 15, 140:22-145:22; Ex. 8).) But the historical content of Defendants' website can be easily verified at the "Wayback Machine" located at www.archive.org, which confirms that Defendants were indeed using the UL marks throughout 2016. (SUF 25.)

## III.   ARGUMENT

There are only three legal issues for the Court to resolve: (a) whether Defendants placed false UL Certification Marks on their website; (b) whether Defendant's act of placing false UL Certification Marks on their website was willful; and (c) the amount of UL's statutory damages under 15 U.S.C. §1117 (c).

### A.   Defendants Are Liable for Trademark Counterfeiting and Statutory Damages Under 15 U.S.C §1117(c).

UL must establish (1) ownership of a valid, legally protectable mark; and (2) Defendant's use of the mark is likely to cause consumer confusion. *Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999). Counterfeiting is merely a special case of trademark infringement; "[a] 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

#### 1)   UL Owns Legally Protectable Marks.

UL's federal trademark registrations with the U.S. Patent and Trademark Office are *prima facie* evidence of the validity of the UL's marks, and of UL's exclusive right to

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

use the marks. *See* 15 U.S.C. § 1057(b); *Applied Info. Scis. Corp. v. eBAY, Inc*., 511 F.3d 966, 970 (9th Cir. 2007). UL has provided proof of its trademark registrations, along with evidence of its extensive and continuous use of the marks in commerce. (SUF 1-6.) Indeed, two (2) marks have reached "incontestable" status. (SUF 4.) Thus, there is no genuine issue of material fact regarding the protectability and validity of the UL's marks.

### *2)  Defendants Counterfeited UL's Marks.*

There is no *genuine* dispute as to any material fact regarding Defendants' counterfeiting – Defendant's website advertised Defendants' hoverboards as UL-certified, and Defendants' hoverboards were not UL-certified.

UL has provided the Court with several screenshots at different points in time, from Defendants' own website as well as Defendants' social media accounts, all showing Defendants' persistent claims that their products were UL-certified. (*See* SUF 16, 17, 25, 35; Ex. 17.) Defendants' only recourse to date has been to deny that these screenshots are accurate. But merely denying a fact does not create a *genuine* dispute of material fact. *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990). Tellingly, Defendants have refused to produce any actual documents showing the purported content of their website. (Nelson Decl., ¶ 38.) Further, one can easily confirm the historical content of Defendants' website by entering it into the Wayback Machine at www.archive.org. (*See* SUF 25; Ex. 19.)

Nor is there a genuine dispute of material fact that Defendants are not, and have never been, customers of UL. (SUF 41; Walker Dep., Exhibit 13, 50:15-52:4, 53:8-20.) UL has never authorized Defendants to use the UL marks in any way. (*Id.*) Yet Defendants advertised their hoverboards as UL-certified at least as early as December 2015 – more than a month before UL announced the UL 2272 safety standard and nearly six months before UL had issued *any* certification for *any* hoverboard. (SUF 16, 19-21; Ex. 17.) Defendants continued to do so throughout 2016. (SUF 25; Exs. 19-21, 34-40.)

While Defendants' supplier *eventually* developed a product that was UL-certified, those UL-certified hoverboards did not enter the United States until August 2016—nine

CHI 67942460v7

months *after* Defendants began advertising their hoverboards as UL-certified. (*See* SUF 16, 36; Ex. 27.) Tellingly, when those UL-certified hoverboard finally arrived at the U.S. warehouse of Defendants' supplier, Defendants rejected those hoverboards in favor of cheaper, non-certified hoverboards – all while still advertising their products as UL-certified. (SUF 38-40; Exs. 28-29.) The fact that Defendants' supplier *eventually* obtained certification for certain hoverboard models has no bearing on Defendant's liability for three reasons: first, Defendants have not produced a single invoice, purchase order, receipt or email showing they ever actually purchased a UL-certified hoverboard; second, Defendants' own text messages and emails clearly show Defendants *rejecting* UL-certified hoverboards in favor of cheaper, non-certified hoverboards; and third, the *earliest* date Defendants could have purchased a UL-certified hoverboard was August, 2016, which was at least nine months after Defendants began advertising their products as UL-certified.

### 3) Defendants' Counterfeiting Created a Likelihood of Confusion.

The likelihood of confusion analysis tests whether the similarity of the marks is likely to confuse customers as to source or sponsorship of the products. *Brookfield*, 174 F.3d 1036, 1053 (9th Cir. 1999). Likelihood of confusion is determined using an eight-factor test: (1) strength of plaintiff's mark; (2) relatedness to the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979); *SATA GmbH & Co. KG v. Wenzhou New Century Int'l*, 2015 U.S. Dist. LEXIS 147637 (C.D. Cal. Oct. 19, 2015). These factors are intended as "an adaptable proxy for consumer confusion" rather than a rote checklist. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011).

Everyday trademark infringement becomes counterfeiting when the trademark used by the alleged counterfeiter is "identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. "Counterfeiting is 'hard core' or 'first

12

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

degree' trademark infringement and is the most egregious form of 'passing off.'" 4 J. Thomas McCarthy, *McCarthy on Trademarks* §25.10, at 25-17 (2002). Thus, analysis of the likelihood of confusion factors may well be overkill for a counterfeiting case. Nevertheless, the likelihood of confusion factors all weigh heavily in UL's favor:

Factor (1) Strength of Plaintiff's Mark: UL serves all members of the public, consumers, manufacturers, suppliers, retailers, vendors, trade groups, industry associations, regulatory bodies, and governmental bodies. UL's marks appear on *billions* of household and consumer products, and UL has been around for over 100 years. (*See* SUF 2; *see also* Pollock Decl., Dkt. No. 6, at ¶ 10.) UL's marks have strong commercial recognition, and it would not be unreasonable to say that UL's marks are among the strongest in the world.

Factor (2) Relatedness to the Goods: Defendants used counterfeit UL marks on the kind of goods (electrical devices) that UL regularly certifies. Indeed, Defendants' counterfeiting arose *in response* to widespread concern regarding hoverboards, for the *very purpose* of alleviating consumer concerns. (*See* SUF 16-18.)

Factor (3) Similarity of Marks: The marks are identical. (*See* SUF 3, 16-17, 25.)

Factor (4) Evidence of Actual Confusion: Actual confusion is inevitable. Defendants are using counterfeits of UL's marks for the express purpose of misleading consumers into believing that Defendant's products are certified by UL, in direct response to widespread concern regarding hoverboard safety. (*See* SUF 16-18, 25.)

Factor (5) Marketing Channels Used: Defendants are marketing their hoverboards in the exact same channels to the exact same consumers that sellers of genuinely-certified hoverboards use. (*See* SUF 16-17, 25.)

Factor (6) Degree of Purchaser Care: Because the UL mark is so widespread, consumers are unlikely to inquire further when it is heavily advertised the way Defendants advertised it. (*See* SUF 2.)

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

CHI 67942460v7

Factor (7) Defendant's Intent in Selecting the Mark: Defendants' intent in selecting the marks is obvious – they wished to deceive consumers into believing their products were safe. (*See* SUF 16-17, 25.)

Factor (8) Likelihood of Expansion of Product Lines: This factor is not particularly relevant to this case and does not favor either UL or Defendants.

### *4)  15 U.S.C. § 1117 (c) Imposes Liability Regardless of Willfulness.*

In 1996 Congress passed the Anticounterfeiting Consumer Protection Act to combat the growing problems posed by counterfeit goods, which added provisions for giving trademark owners to recover statutory damages in cases involving the use of counterfeit marks. In particular, 15 U.S.C. § 1117 (c) provides:

> (c) In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of –
>
> (1) not less than $1000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
>
> (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

Importantly, liability for statutory damages under 15 U.S.C. § 1117 (c) does not depend on whether there is a showing of intentional counterfeiting. Statutory damages are required for even "innocent" counterfeiting, which gives merchants an incentive to ensure the goods they offer for sale are genuine. *See Lorillard Tobacco Co. v. S&M Central Service Corp.*, 2004 WL 2534378 (N.D. Ill. Nov. 8, 2004) (noting statutory

CHI 67942460v7

damages added "due to the concern that a counterfeiter might hide, alter or destroy records, this making it impossible for a plaintiff to determine…actual damages"). Knowledge and intent are still relevant, however, since statutory damages are allowed only up to $200,000 per mark per type of good for innocent counterfeiting, whereas for willful counterfeiting the statutory damages can be ten times that much, up to $2,000,000 per mark per type of good. Additionally, if use of a counterfeit mark is found to be willful, an award of attorneys' fees is mandatory (15 U.S.C. § 1117(b)).

In this case, as discussed, the counterfeit UL Certification Mark on Defendant's website bears counterfeit imitations of the following three registered UL trademarks:

- ® (Reg. No. 782,589);

- ® (Reg. No. 2,391,140); and

- UL Service Mark (Reg. No. 4,201,014).

Accordingly, UL is entitled to statutory damages of between $3,000 and $600,000 if the Defendants' conduct is deemed merely non-willful. However, if the Court finds the Defendants were willful – and UL believes it should – UL is entitled to recover up to $6,000,000 ($2,000,000 per counterfeited trademark).

### B. The Undisputed Facts Show that Defendants Were Willful.

The evidence of Defendants' willfulness is overwhelming. As shown, Defendants were put "on notice" that their hoverboards were not certified by UL on several occasions, but kept advertising them as UL-certified anyway. (*E.g.*, SUF 16-39.) Defendants' own text messages reveal that Defendants deliberately chose to sell non-certified hoverboards *even after certified hoverboards became available.* (SUF 34-38, 40.) Defendants also obstructed discovery and evaded the Court's orders so they could continue capitalizing on their counterfeiting after this lawsuit was filed. (SUF 42-55.)

First, Defendants always knew that they did not have permission to use the UL marks because they never asked UL for permission to use the UL marks. (*See* SUF 41.)

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

This alone is evidence of willfulness; one cannot use another's trademarks without permission. *AARP v. Sycle,* 991 F.Supp.2d 224, 229-30 (D.D.C. 2013).

Second, UL's press release regarding UL 2272 certification put Defendants on notice that their hoverboards were *not* UL-certified. Defendants admit they heard of the UL 2272 Standard when the safety standard was first released by UL in February 2016. (SUF 22; Walker Dep., Ex. 15, 50:15-52:4, 53:8-20.) The press release makes clear that no hoverboard certification existed prior to that date. (SF 21; Ex. 16.)

Third, UL's April 26, 2016 cease and desist letter again put Defendants on notice that their hoverboards were *not* UL-certified, and that they were not authorized to use the UL Marks. (SUF 26.) Defendants cannot deny receiving this letter, since they immediately contacted their supplier, who confirmed that it had merely applied for UL certification. (SUF 27-28; Ex. 22.)

Fourth, the CPSC put Defendants on notice that UL certification was an important factor in determining whether a product is safe for sale. (SUF 29; Ex. 23.) Defendants already knew their product was not certified by UL, but checked in with their supplier who again confirmed that it was merely in the process of applying for UL 2272 certification. (SUF 30; Ex. 24.)

Fifth, UL's May 18, 2016, phone call again put Defendants on notice that their hoverboards were not UL-certified. (SUF 31.)

Sixth, Defendants posted a news article on June 6, 2016, representing to consumers that "Space Chariot Hoverboards are UL 2272 Certified," despite the letters and phone call from UL, and despite the supplier's confirmation that it had not obtained UL 2272 certification. (SUF 33; Ex. 20.)

Seventh, when Defendants eventually had an opportunity to purchase UL-certified hoverboards, they purchased non-certified hoverboards instead. On August 8, 2016, Defendants delivered a non UL-certified hoverboard to a UL investigator, even though their supplier had UL-certified hoverboards in stock. (SUF 36-37.) On August 27, 2016, Walker complained to his supplier: "You can't keep charging me so much for non UL

16

CHI 67942460v7

2272." (SUF 38; Ex. 28.) Defendants' text messages even confirm that they were still buying non-certified hoverboard on October 18, 2016, just two weeks before this lawsuit was filed: "My price for non UL is $150. I just bought 2 non UL." (SUF 40; Ex. 29.) Defendants have not produced a single text message, email, invoice, or other document showing that Defendants purchased a UL-certified hoverboard.

Eighth, despite explicitly choosing to buy non-certified hoverboards, Defendants issued a press release on September 22, 2016, picked up by FOX 5 KVVU-TV, stating that Defendants are "The Safest Hoverboard Company Around," and that all their hoverboards are UL 2272-certified. Defendants continued to advertise their hoverboards as UL-certified in October, while evidence obtained from Defendants confirms they were still purchasing non-UL-certified hoverboards. (SUF 39; Ex. 21.)

In sum, based on Defendants' own documents and admissions, Defendants willfully and maliciously used counterfeits of the UL marks to promote their goods as being safe, despite being put on explicit notice, on several occasions, that UL had not certified the hoverboards that Defendants were selling. Leaving no room for doubt, Defendants continued this willful and malicious behavior in discovery, simultaneously withholding documents while providing false information so that Defendants could dissipate their assets. (*See* SUF 42-55; *see also* Nelson Decl. (at Exs. 12-13, 34-44).)

## C. The Undisputed Facts Justify $2,000,000 in Statutory Damages.

Courts have broad discretion in setting the amount of a statutory damages award. *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 124, 1229 (7th Cir. 1991); *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999). To aid in evaluating the appropriate amount of statutory damages, courts have turned to copyright law, which has a similar statutory damages provision, and have applied the same factors to trademark statutory damages cases. *Sara Lee*, 36 F. Supp. 2d 161, 166. Those factors include:

> (1) whatever dollar figures are available, such as the expenses saved and the profits reaped by the infringers, the revenues lost by the plaintiff, and the value of the trademarks;

CHI 67942460v7

(2) the defendant's culpability and its cooperation in responding to discovery; and

(3) the deterrent effect on the defendant and others.

*Id.*

Here, UL seeks $2 million in statutory damages, which is only a third of the $6 million that the Court could award for willful infringement. Several factors in this case call for such a damages award, including: Defendants' malicious counterfeiting, obstructive discovery behavior, failure to produce complete sets of documents, violation of court orders, and refusal to accept responsibility. Considering these factors alongside the estimated amount of Defendants' profits from counterfeiting, an award of $2 million is appropriate. Much of this already has been covered extensively above; below, we elaborate on just some of these points.

### 1) Defendants Had Up To $2,000,000 in Sales.

The first factor for the Court to consider is whatever dollar figures are available. Here, the evidence available to UL and the Court is limited, because Defendants have never produced a complete accounting of sales. UL did recover one report that was attached to an email from Walker, which report showed approximately $450,000 in online sales from September 2015 to October 2016. (SUF 56; Ex. 31.) UL has not been able to compare these sales figures against Defendants' cash flow because Defendants have not produced the necessary bank statements. (SUF 54.) Nor is there any way of knowing whether this is 50%, 75%, or 90% of Defendants' sales, since Defendants have not produced documents from their other merchant service accounts, and have not produced any accounting of their cash sales. (*See* Nelson Decl. (at Walker Dep., Ex. 15, 99:23-100:16 (describing cash practices)).) In at least one email to a potential vendor, a Space Chariot employee stated that Space Chariot had made "millions in sales" in 2015. (SUF 56.) And, Walker elsewhere claimed $2,000,000+ in sales. (*Id.*) Accordingly, Space Chariot's actual sales range somewhere between $450,000 and "millions."

Defendants' costs are equally uncertain. Defendants produced a spreadsheet listing only invoice numbers and amounts, from October, 2015 through April, 2016, which total

18

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

around $145,000. (SUF 57; Ex. 30.) Defendants have produced only two of the invoices from this spreadsheet. (*Id.*) Once again, without supporting invoices, bank statements, a general ledger, and date for the full relevant date range, it is impossible to know how accurately this spreadsheet reflects Defendants' cost of goods sold.

The incomplete data provided by Defendants does provide a general ballpark of Defendants' profits, and particularly, the data suggests that Defendants' gross profits were at least around $300,000. Though UL is seeking statutory damages – and cases where Defendants are withholding evidence are precisely the kinds of cases where statutory damages are most appropriate – it is worth noting that UL could alternately seek three times Defendants' profits ($900,000), plus attorney's fees ($160,000), under 15 U.S.C. § 1117 (a) and (b). This combined figure ($1.06 million) should represent the *minimum* damages in this case, since this is based only on the numbers Defendants have allowed UL to see, and does not account for the documents Defendants have withheld.

Another dollar "figure" available to the parties is the value of the UL Marks themselves. Though it is impossible to place a specific dollar figure on the UL Marks, they are clearly far more valuable than even the maximum statutory damages in this case. UL's business is primarily based upon UL's certification marks. Unlike other companies, where marks may appear *on* a product, the UL marks *are* its product. As one of the oldest certification companies in the United States, UL has a global reputation for expertise and has become a symbol of trust and objectivity. Consumers trust the UL marks – that is why Defendants counterfeited them so persistently. With widespread public recognition of the safety risks presented by hoverboards, Defendants knew that consumers would rely on the UL marks in making a purchasing decision. Consumers dissatisfied with Space Chariot hoverboards because of quality and safety do not know they have been deceived. Accordingly, they are likely to associate this dissatisfaction with the UL Certification Mark and lose trust in UL's services. The potential damage to UL's brand is easily orders of magnitude beyond the Defendant's profits, yet Defendants did not care what their counterfeiting could do to the UL brand. The high value of the famous UL marks, and the

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

potential damage caused by Defendants, weighs in favor of a higher statutory damages award.

The final dollar figure available to the parties is the amount of attorneys' fees that UL has had to expend on this litigation, including fees which UL has incurred due to Defendants' obstructive discovery behavior. To date, UL has expended at least $160,000 in attorneys' fees – the majority of which have been incurred in negotiating with Defendants' three separate sets of counsel, seeking third-party discovery when Defendants failed to produce requested documents, and arranging and paying for e-discovery procedures that Defendants themselves claimed they could not carry out due to a purported lack of funds. (Nelson Decl., at ¶ 41.)

### 2) *Defendants Violated Court Orders and Obstructed Discovery.*

The second factor for the Court to consider in fixing the amount of statutory damages is the Defendants' culpability. In this case the Defendants have illustrated "maximum willfulness." Merely using the UL mark knowing that they never sought permission to do so would ordinarily qualify for a finding of willfulness. *AARP v. Sycle,* 991 F. Supp. 2d 224, 230 (D.D.C. 2013). But Defendants' behavior goes far beyond that. They were explicitly told – by UL, and by their own supplier – that their goods were not UL-certified, but Defendants kept advertising their hoverboard as UL-certified again, again, and again. That Defendants kept advertising their goods as UL-certified even after refusing their supplier's late-2016 offer of hoverboards that *were* UL-certified simply underscores Defendants' brazen disregard for the law.

Defendants also demonstrated a brazen disregard for public safety. Rather than take the risk of fire and bodily injury seriously, Defendants took *advantage* of consumers by *actively misleading* the public that their products were "certified safe." After the CPSC told Defendants that their products should comply with safety standards, Defendants' supplier explicitly confirmed that the products were still being tested. (SUF 29-30; Ex. 24.) Defendants knew that their hoverboards had *not* been certified to any safety standard, and even with the CPSC conducting an investigation Defendants *still*

20

CHI 67942460v7

kept telling the public that their products were "certified" and "safe." (*See* SUF 32-33.) In short, as long as the profits were rolling in, Defendants eagerly gambled with their customers' safety.

Incredibly, Defendants have "doubled down" since this lawsuit was filed. They violated the TRO by creating other domain names, <truehoverboard.com>, <spacechariotca.com>, and <perfecthoverboards.com>, and continuing to do business under those domain names (likely still selling un-certified hoverboards as UL-certified, but since Defendants have produced no records relating to these domains, the actual scope of sales is impossible to verify). (*See, e.g.*, SUF 42-48 & Exs. 12-13, 34-44.) The Space Chariot Facebook page directed consumers to buy "Space Chariot Hoverboards" on the <truehoverboard.com> website, and the <spacechariot.com> domain automatically directed consumers to <perfecthoverboard.com>. These other sites looked identical to Space Chariot's website, sold identical hoverboard models, and shared the same contact information, phone numbers and addresses as Space Chariot. Defendants claimed they had no connection to these websites or hoverboard sales and had no contact information for these websites, despite the obvious connections to Space Chariot. (SUF 49-51.)

But Defendants were brazenly lying. While claiming that they knew nothing about these other domains, Defendants *sold* at least one of these domains in violation of the asset freeze order Defendants *stipulated* to. (SUF 49-55 & Exs. 12-13, 34-44.) Thus, Defendants violated the stipulated order less than a week after it was entered. Defendant Mortel even created an entirely new domain name, <creativegeniusess.com>, to assist with Defendants' hiding of evidence. (SUF 55; Ex. 44) Defendants used a new email address at <theecreativegeniuses.com> to conduct the sale of their assets. (SUF 55; Ex. 47.) Defendants even lied to the purchaser of those assets, using the alias "Creative Geniuses Inc.," when no such corporation exists. (Wesel Decl. at ¶ 13.)

Defendants also obstructed discovery by failing to produce documents. Defendants agreed to produce bank records, a revision history of their website, and to identify the nature of their relationship with the <truehoverboard.com>, <perfecthoverboards.com>,

21

CHI 67942460v7

and <spacechariotca.com> domains. Defendants did not provide this information, and even affirmatively misstated their relationship with at least one of these domains. (*See, e.g.*, SUF 49-55; *see also* Nelson Decl., ¶¶ 37-39 & Exs. 12-13, 34-44, 47.) UL eventually had to pay for an eDiscovery vendor to obtain emails from Defendants' email accounts – only to find out that Defendants had created an entirely new email account for circumventing the Court's orders. (Nelson Decl., ¶ 41, Ex. 47, Ex. 15 (Walker Dep., at 21:5-22).) In sum, Defendants "doubled down" on what was already a case of "maximum willfulness" by repeatedly violating court Orders, – including to which they *stipulated*.

### 3) *The Need for Deterrence is Immense.*

Finally, the Court should consider deterrence in fixing the amount of statutory damages – specific deterrence to the Defendants and general deterrence to others. Courts have recognized that 15 U.S.C. § 1117 is intended to punish those who sell counterfeit goods. *See, e.g.*, *Louis Vuitton S.A., et al. v. Spencer Handbags Corp.*, 765 F. 2d 966, 970 (2nd Cir. 1985). Regardless of the level of willfulness, the penalty must be sufficient to deter manufacturers and distributors from advertising their products as being certified by UL when they in fact are not. Here, the need for both specific and general deterrence is particularly strong.

While dissipating assets in violation of the stipulated asset freeze order, Defendants "doubled down" on social media. For example, although repeatedly claiming to have no assets, just a few weeks ago Walker was posing with his Porsche Panamera on Instagram, referring to himself as "#selfmade":



MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

CHI 67942460v7

(SUF 58; Ex. 46.)

By way of further example, over the holidays – presumably with the money obtained from selling Defendants' assets in violation of this Court's asset freeze Order, Walker and Mortel spent their time at Big Bear Mountain:



(SUF 58; Ex. 46.)

And back in August – right around the time Walker was complaining to his supplier that he was being charged too much for non-certified hoverboards, Walker was posing on Instagram with several $10,000 stacks of hundred-dollar bills, referring to himself as a millionaire and again as "#selfmade." There are *at least* eight $10,000 stacks clearly visible in this picture:



23

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

(SUF 58; Ex.48.)

The money pictured above is the ill-gotten profits that Defendants obtained from their illegal use of the UL Marks. Yet Defendants continue to claim that they have no assets. Because Defendants clearly have no remorse for their wrongdoing, and no sense of accountability for their counterfeiting, the need for specific deterrence here is particularly high.

General deterrence also suggests a high statutory damages award. During the 2015 holiday season, in response to media coverage of flaming hoverboards, manufacturers of hoverboards applied counterfeit UL marks to their hoverboards with astonishing speed. UL has dedicated significant resources this year to addressing this problem. For example, UL filed suit against the country's largest importer of hoverboards, Swagway, in January of 2015 which resulted in a settlement. *UL, LLC v. Swagway, LLC*, Case No. 3:16-cv-00075 (N.D. Ind. Feb. 17, 2016). But UL cannot file suit against *every* importer of counterfeit hoverboards (or other counterfeit goods) – especially those that simply import a few hundred counterfeit items and then disappear. If counterfeiters face only a moderate risk of getting caught, and then are only required to disgorge their profits (which they of course will never disclose), then they will not be deterred. It is essential that counterfeiters pay substantially *more* than their profits, to account for the fact that other counterfeiters may not get caught at all. Only then are potential counterfeiters deterred from future infringement.

The amount UL seeks here – $2 million – is carefully calibrated to the facts of the case. UL believes that Defendants' $450,000 in sales underreports Defendant's actual sales (particularly in light of Walker's own statement that his sales exceeded $2,000,000 (*see* SUF 56; Ex. 48), but Defendants' profits on that $450,000 in sales should be about $250,000 to $300,000. Trebling that number, and adding attorney's fees, results in $1.06 million. That number needs to be further enhanced to account for Defendants' failure to produce documents, Defendants' underreporting of sales, Defendants' willfullness,

24

MEMORANDUM I/S/O MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants' discovery behavior, and Defendants' apparent lack of remorse, as reflected in their social media behavior and their violation of the Court's orders. A $2 million statutory damages award properly accounts for these factors, while still falling far short of the maximum $6 million in statutory damages that the Court could award.

### D. The Undisputed Facts Justify an Award of Attorneys' Fees.

Defendants' willful infringement of UL's marks, obstruction in discovery, and blatant disregard for Orders of this Court make this case an exceptional one under 15 U.S.C. § 1117 (a). Though there is an ongoing spit of authority as to whether fees are part of statutory damages, the better reasoned cases suggest such fees should be awarded alongside and in addition to statutory damages. *See Louis Vuitton Malletier S.A. v. LY USA, Inc., et al* 676 F. 3d 83, 111 (2d Cir. 2012) (recognizing split; affirming district court award of attorneys' fees in addition to statutory damages).

## IV. CONCLUSION

For all these reasons, the Court should (1) grant partial summary judgment in favor of UL on the issues of liability for UL's claim of willful trademark infringement and counterfeiting under the United States Trademark Act, 15 U.S.C. § 1051 *et seq.*, (2) award $2 million in statutory damages, and (3) award UL its costs and attorneys' fees.

Dated: February 22, 2017

Respectfully submitted,

GREENBERG TRAURIG, LLP

*/s/* Matthew R. Gershman
*Attorneys for Plaintiff UL LLC*

25

CHI 67942460v7